### In re Pamela GOOCH, Debtor.

No. 99–56705.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

July 7, 2000.

Frank M. Pees, Worthington, OH, Standing Chapter 13 Trustee.

Jeffrey M. Kellner, Worthington, OH, Office of the Standing Chapter 13 Trustee.

Alexander G. Barkan, Columbus, OH, Assistant United States Trustee.

Samuel L. Calig, Columbus, OH, for Debtor.

Charles W. Kettlewell, Worthington, OH, for Jeffrey W. Farkas.

Christopher J. Minnillo, McCorkle & Minnillo, Columbus, OH, for Timothy R. Farkas.

### MEMORANDUM OPINION AND ORDER

CHARLES M. CALDWELL, Bankruptcy Judge.

This Memorandum Opinion and Order constitutes the Court's Findings of Fact and Conclusions of Law on the Order Requiring Jeffrey W. Farkas and Robert C. Bannerman to Appear and Show Cause Why They Should not be Disciplined Pursuant To LBR 2090–2 [1] ("Order to Show Cause"). Hearings were conducted on

---

1. Pursuant to LBR 2090–2(a), the Ohio Code of Professional Responsibility applies in bankruptcy proceedings pending in this District.

January 4, 2000, and February 1, 2000, and the Court has considered Post Trial Briefs filed by Robert C. Bannerman ("Mr. Bannerman") [2] and Jeffrey W. Farkas ("Mr. Farkas"). Based upon the testimony received, including this Court's assessment of the relative credibility of witnesses, and documents received into evidence, the Court has found and concluded that the imposition of disciplinary measures is warranted. To understand the bases for the Court's decision, a history of this case is provided.

On January 29, 1998, the Debtor, Pamela Gooch ("Debtor"), filed her first chapter 13 bankruptcy proceeding, represented by Mr. Farkas. At that time, the Debtor scheduled the ownership of a home that was subject to a mortgage with an arrearage in the approximate amount of $5,000.00. After various amendments, the Court finally confirmed on May 22, 1998, a plan that proposed to cure the mortgage arrearage and provided a one hundred percent dividend to general unsecured creditors. On June 25, 1999, the Standing Chapter 13 Trustee ("Trustee") filed a Motion to Dismiss based upon the accrual of an arrearage of approximately five months in plan payments. No response was ever filed on behalf of the Debtor, and on July 30, 1999, the Court entered an Order of Dismissal. The Chapter 13 Final Report and Account filed on September 22, 1999, indicated that the sum of $850.00 in legal fees was paid to Mr. Farkas, and that no funds had been disbursed on the mortgage arrearage claim. On October 29, 1999, the Court entered an Order Approving Final Report and Closing Case.

Even before the first case was dismissed, Mr. Farkas filed the second and instant chapter 13 proceeding on July 26, 1999. The schedules filed on that date reflect that the mortgage arrearage had grown from approximately $5,000.00 to the sum of approximately $10,000.00. Indeed, the mortgagee on November 12, 1999, filed a Proof of Claim reflecting a total arrearage of $13,180.15. The Fee Statement Pursuant to Rule 2016(b) indicates that for this second chapter 13, the Debtor agreed to pay Mr. Farkas another $850.00 in legal fees, in addition to the second filing fee in the amount of $160.00. The plan, filed on July 26, 1999, as in the first case, contained the proposals to cure the mortgage arrearage and provide a dividend of one hundred percent to general unsecured creditors, and on October 6, 1999, that plan was confirmed.

On October 7, 1999, however, a foreclosure proceeding against the Debtor was commenced in the Franklin County Court of Common Pleas. The Debtor was served by certified mail on October 13, 1999. On that very same day, the Debtor received two solicitation letters dated October 12, 1999, one from the Farkas firm signed on behalf of Mr. Farkas and one from Alexandria Properties, Inc. ("Alexandria") signed by Timothy R. Farkas ("Mr. Timothy Farkas") [3] operating from the same East Livingston Avenue address used by the Farkas firm. Both letters offered free consultations and provided telephone numbers to make appointments.

In relevant part the letter from the Debtor's counsel, the Farkas firm, stated:

> Public records at the Franklin County Courthouse indicate that a foreclosure action may have been filed against your interest in property .... *Although I have never represented you in the past and do not know you, I am sending this letter to inform you of some of the possible alternatives.* If no foreclosure has been filed, *if you are not a debtor* or if

---

2. Mr. Bannerman is an associate in the offices of Jeffrey W. Farkas, known as the Farkas Law Firm ("Farkas firm"), and located at 303 East Livingston Avenue, Columbus, Ohio 43215 and 6740 Cleveland Avenue, Columbus, Ohio 43231.

3. Mr. Timothy Farkas is the brother of Mr. Farkas.

you have a lawyer, please disregard this letter . . . . .

Federal legislation for debtor protection provides numerous ways that may be able to stop a foreclosure and stop bill collectors from using harassing tactics, including utility shutoffs, wage garnishments, and car repossessions. *Most importantly, you may be able to keep your house and your personal belongings, subject to certain limitations.* You may even qualify to pay off your credit card debt and medical bills at a reduced amount. . . . (emphasis supplied).

In relevant part, the letter from Alexandria stated:

**It has come to our attention that a foreclosure action may have been filed against your interest in property** . . . . The foreclosure may have been filed without your knowledge. This lawsuit can eventually result in the Franklin County Sheriff's Department selling this property at a public auction. However, we can help you prevent this . . . .

*We are a professional investment company that provides assistance to home-owners. Our staff, with over ten years of experience, has counseled hundreds of people, like yourself, to avoid foreclosure. Call us and learn how to:*

1) **Keep your property by satisfying back payments**

2) **Receive cash for your property (immediately)**

3) **Stay in your home without coming up with additional money**

4) **Have a free consultation with our foreclosure experts.**

. . . (emphasis supplied).

On November 4, 1999, a letter from the Debtor to the undersigned, dated November 1, 1999, was received in the Clerk's Office. In relevant part, the Debtor stated:

I am writing regarding what I feel is negligence on the part of my attorneys: Jeffrey Farkas and Robert Bannerman. *I received a notice from my mortgage company . . . stating they were going to foreclose on my home. I called my attorney Mr. Bannerman and faxed him a copy of the notice. He told me he would take care of it.* On October 4, 1999, my chapter 13 plan was confirmed, but (the mortgage company) had not filed a claim. Mr. Bannerman told me this was not unusual and all creditors had until November 30, 1999 to file a claim. *Then on October 13, 1999 I received a notice of "Complaint in Foreclosure". That same day I received advertisement letters from (the) Farkas Law firm offering to counsel me on alternatives to foreclosure, and from Alexandria Properties (Timothy Farkas, Pres.) listing possible options including receiving cash for my home. . . . For the last 3 weeks I have called the office several times and left messages for both attorneys Farkas and Bannerman. My phone calls have not been returned and I have Absolutely (sic) no idea what, if anything, is being done about the foreclosure.* I would greatly appreciate any guidance or assistance you could give me in getting answers to (the) following questions: *Does the attorneys' responsibility end with the confirmation? Could there be a conflict of interest since my attorneys' brother is in the business of buying properties on the verge of foreclosure? What can I do to ensure that my case is being handled properly and ethically?* (emphasis supplied).

On November 3, 1999, the foreclosure proceeding was voluntarily dismissed by the mortgagee. Based upon the receipt of the November 1, 1999, letter, however, the Court entered the Order to Show Cause on November 19, 1999. At that time, the Court was primarily concerned with the apparent lack of any timely response on behalf of the Debtor regarding the foreclosure proceeding and the apparent lack of communication between the Farkas firm and the Debtor. The Court was also concerned with the dual solicitation of the

Debtor by her bankruptcy counsel and another entity operating from the same building, both simultaneously offering to respectively address the pending foreclosure proceeding through the provision of legal services or purchase of the property.[4] In the Order to Show Cause, the Court required the attendance of the Debtor, and Messrs. Farkas, Timothy Farkas, Bannerman, and their counsel. The hearing was set for January 4, 2000.

Subsequent to issuance of the Order to Show Cause, a Motion to Dismiss Case was filed on November 30, 1999, by the Trustee on the basis of a plan payment arrearage. On December 17, 1999, the Court entered an Order Granting Debtor Additional Time to Respond to Trustee's Motion to Dismiss, based upon the Debtor's statement that she was in the process of retaining new counsel. On December 30, 1999, a Memorandum Contra Motion to Dismiss Case was filed on behalf of the Debtor by attorney Samuel L. Calig ("Mr. Calig"), and on February 2, 2000, the Court entered an Agreed Entry providing for the continuation of the present case subject to the maintenance of all plan payments on a current basis. This arrangement was negotiated by new counsel, Mr. Calig. A review of the file does not indicate any further plan payment problems.

At the initial hearing on the Order to Show Cause conducted on January 4, 2000, Mr. Farkas appeared, represented by Charles W. Kettlewell; Timothy R. Farkas appeared, represented by Christopher J. Minnillo; Mr. Bannerman appeared on his own behalf; and the Debtor appeared without her new counsel, Mr. Calig. At that time, the Court heard testimony from Messrs. Farkas, Timothy Farkas, and

Bannerman in response to specific questions from the Court provided to the parties immediately prior to the hearing. The Court also heard testimony from present and former clerical employees of the Farkas firm, Tanika Saunders ("Ms. Saunders"), Jodi Kidder ("Ms. Kidder"), and Danielle McDade ("Ms. McDade").[5] During the January 4, 2000, hearing, Mr. Bannerman called the Debtor as a witness; however, the Court declined to hear the testimony at that time because Mr. Calig was not present. The Court subsequently advised Messrs. Farkas, Bannerman and Timothy Farkas, and their counsel, that they would be given leave to elicit testimony from the Debtor at a continued hearing to be conducted on February 1, 2000.

On January 7, 2000, January 10, 2000, and January 18, 2000, pleadings were filed and correspondence was received indicating that the subjects of the Order to Show Cause no longer wished to elicit testimony from the Debtor. As a result, on January 18, 2000, the Court entered an Order Regarding Order to Show Cause requiring the Debtor and Mr. Calig, as well as the original subjects of the Order to Show Cause, to attend the February 1, 2000, continued hearing. The Court took this action to ensure that the record was complete in view of the Debtor's allegations, and the testimony provided by the subjects of the Order to Show Cause. At the February 1, 2000, hearing, the Debtor testified, was subject to cross examination, and was questioned by the Court.

The testimony elicited and documents received into evidence on January 4, 2000, and February 1, 2000, are not in dispute regarding the basic facts surrounding the foreclosure proceeding, e.g., its commence-

---

4. There have been instances where other bankruptcy counsel has been disciplined for seeking to acquire an interest in the property of debtors. *See Columbus Bar Association v. Ewing,* 75 Ohio St.3d 244, 661 N.E.2d 1109 (1996).

5. The Court declined to hear testimony offered by Messrs. Farkas and Bannerman from counsel for the Trustee, Jeffrey Kellner, and

from an unrelated bankruptcy practitioner, Lloyd Cohen. The Court determined that such testimony was not relevant to the nature of the actions taken by the subjects of the Order to Show Cause. The Court was primarily interested in having the subjects of the Order to Show Cause explain their actions in view of the Debtor's serious allegations.

ment, ultimate voluntary dismissal, and the existence of the October 12, 1999, letters detailed above. There also is no dispute regarding the nature of the relationship between the Farkas firm and Alexandria. There is, however, a substantial dispute regarding the nature and timeliness of the actions of the subjects of the Order to Show Cause and what was communicated to the Debtor regarding the mortgage foreclosure. There is also significant dispute regarding the impact and propriety of the October 12, 1999, correspondence.

Regarding the actions taken by the Farkas firm pertaining to the foreclosure proceeding, the Court has considered the testimony of current and former support staff in the Farkas firm, the testimony of Messrs. Farkas and Bannerman, and compared it to the testimony of the Debtor. In this endeavor, the Court has made credibility assessments based upon its observations of the witnesses, the substance of their testimony, and the context in which actions were taken.

The Debtor's testimony shed significant light on the history and purposes of her two bankruptcy filings and the nature of her relationship and contact with Messrs. Farkas, Bannerman and Timothy Farkas. Her testimony is at variance with that provided by Messrs. Farkas and Bannerman and the support staff of the Farkas firm. Regarding the history of her two cases, the Debtor testified that her first chapter 13 case was filed because she was at risk of having her home go into foreclosure. The Debtor testified that Mr. Farkas was contacted to file the first case based upon his ad in the Yellow Pages. The Debtor testified that during an appointment with Mr. Farkas to prepare bankruptcy pleadings, she also met Mr. Timothy Farkas. The Debtor testified that he came into the room after her consultation with Mr. Farkas had begun, and while Mr. Farkas had temporarily stepped out. The Debtor testified that at that time, "... He (Timothy Farkas) sat down in the conference room across the table

from me, asked me some questions like how much—what my home was worth or what my interest rate was and that kind of thing...." The Debtor's testimony is in conflict with that of Mr. Timothy Farkas, who testified he never met the Debtor. On this point, the Court finds the Debtor's version more credible.

The Debtor testified that her first case was a failure because her employer indicated that they could not withhold the entire amount required under the plan, and that when this was brought to the attention of Mr. Farkas, including sending him correspondence from the employer, she never heard anything from Mr. Farkas. Because the arrearage in plan payments began to accrue, the Debtor testified that the plan was modified, but she could not afford the higher payments. The Debtor testified she was advised by Mr. Farkas that the first case had so many problems, it would be preferable to file another case, rather than attempting to correct the problems in the first one.

The Debtor testified that at the time the second case was filed, she paid the additional filing fee and understood that Mr. Farkas' fees for the second case would be paid as part of the plan. The Debtor testified that in the time between the 341 meeting (conducted on September 1, 1999), and the confirmation hearing (conducted on October 4, 1999), she received a notice of default from her mortgage company. The Debtor testified she conveyed this information to Mr. Bannerman, who responded that he did not know why it was received, but that she should fax him a copy so he could take some action. The Debtor testified that she faxed the notice, but did not receive any further information from Mr. Bannerman until the confirmation hearing. The Debtor testified that she again brought the matter to the attention of Mr. Bannerman at the confirmation hearing, but was told that the matter would be addressed once the mortgage lender filed a claim.

The Debtor testified that when she received the foreclosure complaint and the above-described October 12, 1999, correspondence from Messrs. Farkas and Timothy Farkas all on the same day, her response was one of, "... Panic, confusion, I didn't know what was going on, I didn't know why I received the advertisement letters and that kind of thing." The Debtor testified that as a result, and on the same day, she called the Farkas firm and talked with Ms. McDade. After explaining what she received in the mail, she initially asked to speak to Mr. Bannerman because he attended hearings with her, and when she was told that he was not in, she asked to speak to Mr. Farkas, who also was not in. The Debtor testified that she asked that Mr. Farkas return her call. The Debtor testified that even after Ms. McDade explained that the letters are mailed automatically, she still asked that Mr. Farkas return her call regarding the foreclosure complaint and what could be done. The Debtor testified that she called the Farkas firm as many as four times and would ask for an immediate return phone call, but still did not receive a phone call from Messrs. Farkas and/or Bannerman.

The Debtor testified that after her initial conversation with Ms. McDade on the date she received the foreclosure complaint, she was not able to talk to anyone at the Farkas firm about her case. The Debtor testified that at that point, "I didn't know what to do next, so I drafted a letter to the Court on the 25th (October 25, 1999) ..." The Debtor went on to testify however, that she did not mail the letter that day because, "... I decided to give the office another call. So I got up that morning (October 26, 1999) and I called and I left a message. There's another number you call and you get a voice machine all the time. So I left a message on that machine explaining that I had called several times and no one returned my phone call, and I received a foreclosure notice and asked him to give me a call or I was going to file a complaint because I didn't know what else to do next...." The Debtor testified

that after still not receiving any contact from the Farkas firm, she mailed the letter to the Court on November 1, 1999.

The Debtor testified that approximately two weeks after leaving her October 26, 1999, voice mail message, she received a message in reply from a female employee of the Farkas firm indicating that they were attempting to return her October 26, 1999, call. According to the Debtor, she was instructed to call back to obtain assistance. The Debtor testified that she did not return that phone call because she had already decided to find another attorney. The Debtor testified that she wrote the Court because, "Well, I wanted to make sure that I wasn't at risk of—I wanted to make sure that everything that was going on was legitimate or, you know, to make sure that I wasn't being—I don't know the words, but—It seemed highly irregular to me. Initially once I received all the notices, I was worried. When I couldn't get a return phone call from either attorney (Messrs. Bannerman and Farkas), I really started to worry that maybe, you know, this was intentional or something."

Mr. Bannerman's testimony was informative regarding actions taken by the Farkas firm prior and subsequent to the commencement of the foreclosure. Mr. Bannerman confirmed that the Debtor advised him of her receipt of a notice of default from the mortgage lender shortly after the second bankruptcy filing. He testified that at the time, he advised the Debtor that it was not unusual for such notices to be issued immediately after the commencement of a bankruptcy filing in view of the time required to issue notice to creditors. Mr. Bannerman testified that he advised the Debtor that the home could not be taken, and that if a foreclosure was filed he would take care of it.

Mr. Bannerman testified that once the foreclosure was filed, employees of the Farkas firm faxed bankruptcy information to the mortgage lender, but that no appearance or answer was filed in the fore-

closure proceeding. Mr. Bannerman testified that he did not receive any message to return a phone call to the Debtor after the filing of the foreclosure, and that he had no communication with the Debtor after the filing of the foreclosure. Mr. Bannerman did not provide a satisfactory explanation why he did not contact the mortgage lender immediately after the Debtor's receipt of the default notice and prior to the commencement of the foreclosure proceeding, and why he did not, without regard to a phone message, call the Debtor directly after the filing of the foreclosure.

Mr. Farkas testified that he did not recall receiving any phone messages from the Debtor because the matter was being handled by Mr. Bannerman. Mr. Farkas testified, however, that he called the Debtor after the foreclosure was filed to apologize, to find out with whom she spoke, and why no messages were received by himself or Mr. Bannerman. Mr. Farkas testified that the Debtor indicated she did not have specific dates and times with her. Mr. Farkas testified that he offered to call the Debtor the next day at work, but that the Debtor responded she did not want him to call her back at work. Instead, she indicated she would call him back. Mr. Farkas testified that the Debtor never called back, and that he did not want to call her again because of the level of hostility. Mr. Farkas also did not provide a satisfactory explanation why someone in the Farkas firm did not contact the mortgage lender immediately after the post-petition notice of default was received and prior to commencement of the foreclosure proceeding, and why he did not call the Debtor directly immediately after the foreclosure was filed, without regard to the receipt of a telephone message.

Ms. Saunders testified that she was a former employee of the Farkas firm and confirmed that she sent a telefax to counsel for the mortgage lender on October 13, 1999. Ms. Saunders testified that she could not remember exactly what was transmitted, but that there were four bankruptcy-related documents filed in the Debtor's case. She did testify that she called to verify receipt of the documents. The Court received into evidence the telecopier cover sheet indicating the transmission of six pages, however, the documents were not attached. Ms. Saunders testified that she did not recall ever having any contact with the Debtor.

Ms. Kidder testified that she had been an employee of the Farkas firm for the last six months. Ms. Kidder testified that she was the receptionist, and that while she did not recall whether she ever spoke to the Debtor, she did recall retrieving, one unspecified morning, a voice mail message from the Debtor. Ms. Kidder testified that the Debtor sounded very upset, and that she conveyed this fact and a message to Mr. Farkas. Ms. Kidder testified that she was then instructed by Mr. Farkas to call the Debtor to make an appointment to address her concerns. Ms. Kidder testified that she left a message for the Debtor on an unspecified date, and conveyed the desire of Mr. Farkas to assist the Debtor. Ms. Kidder testified that she does not recall whether the Debtor returned the call. It should be noted that Ms. Kidder's testimony conflicts with that of Mr. Farkas, who testified that he never received any phone messages from the Debtor through his staff.

Ms. McDade testified that she had also been an employee of the Farkas firm for approximately six months. Ms. McDade testified that she talked to the Debtor several times. According to Ms. McDade, the Debtor called her on an unspecified date regarding a notice of default received from the mortgage company. Also, the Debtor called on an unspecified date regarding the October 12, 1999, letters from the Farkas firm and Alexandria received on the same date of service of the foreclosure complaint. Regarding the notice of default from the mortgage company, Ms. McDade testified that she sought to explain why it had been received and offered to have her call returned, but that the

Debtor responded that if she needed any more information she would call back. Ms. McDade testified that to her knowledge, the Debtor did not call back regarding the notice of default.

Regarding the October 12, 1999, letters and the foreclosure complaint, Ms. McDade testified the Debtor asked to speak with either Mr. Bannerman or Mr. Farkas, but that she talked to the Debtor because Messrs. Farkas and Bannerman were not available. Ms. McDade testified that the Debtor was, "considerably upset" with the letter from the Farkas firm because it indicated that she was not a client. Ms. McDade testified that she explained that it was form correspondence, but that the Debtor remained upset and expressed that because Mr. Farkas was her attorney she should not have received the letter. Ms. McDade testified that she again explained that it was a form letter mailed based upon public records, and that Mr. Farkas did not review the letter because the addresses were obtained from the public records. Ms. McDade testified that she was under the impression that the Debtor was finally satisfied with her explanation, that the Debtor declined to have Messrs. Farkas or Bannerman return her call, and that the Debtor stated if there were any further questions she would call back. Ms. McDade testified that she could not recall whether the Debtor ever called back.

Regarding the nature of the relationship between the Farkas firm and Alexandria, the testimony of Messrs. Farkas, Bannerman and Timothy Farkas indicates that Mr. Bannerman does not have any ownership interest and/or management control over the Farkas firm and/or Alexandria. Messrs. Farkas and Timothy Farkas described the nature of the relationship between the Farkas firm, Alexandria, and other enterprises in several areas.

The Farkas firm and Alexandria operate from the same building, located at 303 East Livingston Avenue, that they lease from a corporation known as Beebles. Beebles is co-owned equally by Messrs. Farkas and Timothy Farkas. Mr. Farkas testified that Beebles was formed in 1993 to buy real estate, and that the building was initially purchased by his mother, but it was titled in the name of Beebles with continuing payments being made to the mother. Mr. Farkas testified that some other properties are held in the name of Beebles, and Beebles also owns, "A Loan Company," that was a potential source of post-petition financing for another and unrelated bankruptcy client of the Farkas firm.[6] Mr. Farkas testified that there is no fee-sharing relationship between the Farkas firm, Alexandria, Beebles and A Loan Company.

Mr. Timothy Farkas testified he is the sole owner of Alexandria, and he manages its operations that entail the buying, selling and leasing of real property, including buying properties in foreclosure. Mr. Timothy Farkas testified that Alexandria has never acquired property from a debtor. Mr. Timothy Farkas testified that Beebles does make some loans, and sales loans, and that currently Beebles has loans on its books, but there are no loans to debtors. Mr. Timothy Farkas testified that there was no fee-sharing relationship between the Farkas firm, Alexandria, Beebles and A Loan Company. He did, however, testify that he has referred, without any charge or compensation, bankruptcy clients to Mr. Farkas. He explained that when people in foreclosure respond to his letters and he ascertains that he can't help them, he offers to refer them to Mr. Farkas for bankruptcy advice, or directs them to the Yellow Pages or the Columbus Bar Association. Mr. Timothy Farkas confirmed that some of the people he referred have become bankruptcy clients of the

---

**6.** On November 15, 1999, the Court conducted a hearing in the case of *In re Riebel,* No. 98–58975 in which Mr. Farkas sought approval of financing to the debtors in that case to

be provided by A Loan Company. At that hearing, however, Mr. Farkas advised the Court that on the advice of ethics counsel the request was being withdrawn.

Farkas firm. In the Post–Trial Brief filed on behalf of Mr. Farkas, it was also disclosed that Ms. Kidder, an employee of the Farkas firm, would retrieve foreclosure information for solicitation letters, and that she would mail such letters for both the Farkas firm and Alexandria to the same parties.

Mr. Timothy Farkas testified that through Alexandria he has been mailing out letters similar to those mailed to the Debtor since approximately 1987. He confirmed that addresses are obtained from the Franklin County Common Pleas Court. Mr. Farkas testified that the Farkas firm started mailing letters similar to the one issued to the Debtor around approximately 1995 based upon the foreclosure records of the Franklin County Common Pleas Court. Mr. Farkas testified that the letter mailed to the Debtor was not reviewed by himself or Mr. Bannerman, but was signed for him by a clerical employee. Mr. Farkas testified that effective November 24, 1999, he ceased mailing such letters.

The Court finds the Debtor's version of the events surrounding the foreclosure more credible for several reasons. First, the Debtor unequivocally testified that the purpose of her first and second bankruptcy filings was to protect her home from foreclosure. Her November 1, 1999, correspondence was subsequent to the commencement of the foreclosure proceeding and expressed a high degree of concern over her home and the related actions of Messrs. Farkas, Bannerman and Timothy Farkas. Placing the testimony offered by the subjects of the Order to Show Cause in the most favorable light, former and short-term support staff have simply testified either that they cannot recall having any contact with the Debtor, or that they cannot recall whether she telephoned several times regarding the foreclosure proceeding and requested a return call. The attorneys in the Farkas firm, Messrs. Farkas and Bannerman, have simply testified that they did not receive any phone messages from the Debtor through their clerical employees. Although in the case of Mr. Farkas, his testimony is contradicted by that of his own employee, Ms. Kidder, who testified that she did give him a phone message and received instructions from him.

Such testimony is not sufficient and it would be contrary to common sense for this Court to conclude that this Debtor facing foreclosure, who received the October 12, 1999, correspondence from the Farkas firm and Alexandria, would not make several attempts to reach her counsel to obtain an explanation and assistance directly from her counsel, Messrs. Farkas and Bannerman. Also. Messrs. Farkas and Bannerman have not provided any satisfactory explanation why, as Debtor's counsel, they did not call the Debtor after the foreclosure proceeding was commenced but prior to her contacting the Court.

Messrs. Farkas and Bannerman have sought to defend their actions or failure to act on the basis that the Debtor came to them with significant financial problems, and that indeed, they were so significant that she was unable to complete her first chapter 13 filing. They further assert that they acted promptly to address the foreclosure proceeding once it was filed, and that there was no basis or need to take any action earlier, in their experience. The conclusion Messrs. Farkas and Bannerman would have this Court reach, is that no harm was caused to the Debtor, she was the cause of her financial problems, and that indeed, she failed to contact them to obtain an explanation for their handling of the foreclosure. In addition, Mr. Farkas asserts that there is nothing improper or misleading in the October 12, 1999, correspondence, and there is no relationship between the Farkas firm and Alexandria. The Court does not find such arguments persuasive for the following reasons.

First, it must be noted that the consumer bankruptcy practice has certain attributes that render debtors, like Ms. Gooch, especially vulnerable. Generally, debtors

do not have the experience or time to shop for legal services. They are typically responding on an emergency basis, have never utilized an attorney before, and gravitate toward direct mail advertisements or make attorney choices based upon local news publications and/or the Yellow Pages, as occurred in this case. This manner of selection has an impact upon the outcome of their cases, and the volume nature of the consumer practice drives the level of attention offered.[7] When problems occur in the quality of representation in the bankruptcy process in view of the time required for and nature of the existing attorney disciplinary procedures [8] and the volume nature of the practice, many debtors are impacted. While financial sanctions may be some recompense, because of critical issues such as retaining a home and/or an automobile, the damage done by failures in representation may be for all intents and purposes irreparable.[9] The Debtor in this case came into the process with all of these disadvantages.

Second, the Court recognizes from the history of the two filings and the numerous amendments and modifications and dismissal litigation, that the Debtor had difficulty meeting plan payments, and clearly, like any debtor she bears significant responsibility for payment failures. The Debtor, however, did persuasively testify that payment problems in her first case initially arose because of confusion over the amount of payroll deduction her employer would remit to the Trustee. She testified that this problem was communicated to the Farkas firm, but no action was ever taken. It was obvious to all parties that the home was important to the Debtor, and that at the time of the commencement of the first case, there was a significant arrearage. This arrearage increased rather than decreased during and subsequent to the first filing.

■ Third, the Debtor testified she received, as a result of the mortgage arrearage, a notice of default during the month between her creditors' meeting and confirmation hearing in the second and instant bankruptcy filing. To simply let this second case continue and rely on the mortgage lender filing a claim to receive payment was, at best, highly risky in view of the arrearage. A phone call or letter in this period to the mortgage lender and/or the filing of stay violation litigation,. may have, on a practical basis, prevented the commencement of the foreclosure proceeding.[10] Once the foreclosure proceeding was filed. Messrs. Farkas and Bannerman should have acted aggressively not only to have it dismissed, but also to affirmatively communicate with the Debtor.[11]

---

**7.** The nature and impact of volume practices for consumer debtors has been a source of debate in recent years. *See* William C. Whitford, *The Ideal of Individualized Justice: Consumer Bankruptcy as Consumer Protections, and Consumer Protection in Consumer Bankruptcy,* 68 Am. Bankr.L.J. 397 (1994); Jean Braucher, *Lawyers and Consumer Bankruptcy: One Code, Many Cultures,* 67 Am. Bankr.L.J. 501 (1993).

**8.** The continued efficacy of existing disciplinary structures has been criticized and more consumer-oriented models have been suggested. Allen Blumenthal, *Attorney Self–Regulation, Consumer Protection, and the Future of the Legal Profession,* 3–WTR Kan. J.L. & Pub. Policy 6 (1994).

**9.** It has been suggested that given the unique nature of the bankruptcy process, that perhaps there should be a nationalized system for addressing counsel problems solely in bankruptcy cases. *See,* Nancy B. Rapoport, *Our House, Our Rules: The Need for a Uniform Code of Bankruptcy Ethics,* 6 Am. Bankr. Inst. L.Rev. 45 (1998).

**10.** All bankruptcy attorneys in the Southern District of Ohio are aware of the well-established procedures for bringing automatic stay violations to the Court's attention. *See In re Newell,* 117 B.R. 323 (Bankr.S.D.Ohio 1990); *In re Roush,* 88 B.R. 163 (Bankr.S.D.Ohio 1988); 11 U.S.C. § 362(h) (provides for the assessment of actual and punitive damages, attorney's fees and costs for willful stay violations).

**11.** Canon 6 of the Ohio Code of Professional Responsibility requires that counsel act competently on behalf of clients, and the associated Disciplinary Rule provides that a lawyer

Their apparent reliance upon clerical staff to provide them phone messages as a prerequisite to communication with a client at best reflects a lack of concern with the stress that a foreclosure causes, and at worst constitutes an effort to shift the responsibility for client communication to support staff and/or the client.[12] One scholarly commentator has explained the importance of bankruptcy client communication in the following manner:

> Clients pay lawyers because lawyers are supposed to know the law. But they also pay lawyers because lawyers are supposed to be able to explain the law in lay terms. Too many lawyers risk disciplinary sanctions because they're too busy (or lazy?) to return calls, leaving their clients irate. *A lawyer has a duty to communicate with her client so that the client is kept reasonably informed about the status of his case. It is even more imperative to fulfill that duty when the client is extremely distressed and needs extra hand-holding.* (emphasis supplied).

Nancy B. Rapoport, *Avoiding Judicial Wrath: The Ten Commandments for Bankruptcy Practitioners*, 5 J.Bankr. Law and Practice 615, 631 (1996).

Fourth, regarding the October 12, 1999, correspondence issued by the Farkas firm and Alexandria, while they may be otherwise permissible advertising utilizing widely available public information, their simultaneous issuance from Messrs. Farkas and Timothy Farkas, sharing the same building and utilizing the same lists and same employee to disseminate the letters, had a significant negative impact upon the Debtor. They conveyed the very upsetting impression that the Farkas firm was not aware of its representation of the Debtor and was blindly sending out letters to anyone in foreclosure. Also, they were extremely confusing to the Debtor regarding the status of her case and the level of protection already afforded her home as a debtor.

█ Fifth, Messrs. Farkas and Timothy Farkas, while they may not have any fee-sharing relationship, they do have common financial interests that are impacted by the success of their respective enterprises. They are co-owners of a corporation, Beebles, through which they own A Loan Company and the building from which they both operate. Through these entities, loans have been issued and sold, and other property acquired.[13] The Farkas

shall not, "... Neglect a legal matter entrusted to him." DR 6-101(A)(3). The Supreme Court of Ohio has acted aggressively to suspend and/or disbar where a pattern of negligence and lack of communication has been demonstrated. *Cleveland Bar Association v. Glatki,* 88 Ohio St.3d 381, 726 N.E.2d 993 (2000), reconsideration denied 88 Ohio St.3d 1516, 728 N.E.2d 403 (2000); *Cuyahoga County Bar Association v. Muhlbach,* 86 Ohio St.3d 547, 715 N.E.2d 1134 (1999); *Cleveland Bar Association v. Cicirella,* 86 Ohio St.3d 544, 715 N.E.2d 1131 (1999).

The Supreme Court of Ohio has severely disciplined counsel who also practiced in the Bankruptcy Court primarily representing consumer debtors, for neglecting clients in general, and other related violations. *See Columbus Bar Association v. Emerson,* 84 Ohio St.3d 375, 704 N.E.2d 238 (1999) (indefinite suspension ordered); *Columbus Bar Association v. Emerson,* 88 Ohio St.3d 1462, 726 N.E.2d 1001 (2000) (contempt finding based upon failure to surrender license); *Office of Disciplinary Counsel v. Freeman,* 71 Ohio St.3d

217, 643 N.E.2d 104 (1994) (indefinite suspension of practice until full restitution made to clients), reinstatement denied 73 Ohio St.3d 1418, 652 N.E.2d 203 (1995).

**12.** The Supreme Court of Ohio has discussed the dangers of over-reliance upon clerical personnel in high-volume bankruptcy practices, and the duty of bankruptcy counsel in such practices to actively counsel clients. *See Columbus Bar Association v. Flanagan,* 77 Ohio St.3d 381, 383, 674 N.E.2d 681, 683 (1997).

**13.** Mr. Timothy Farkas testified that there are no loans to debtors and no debtors' property has been acquired. The Court urges disciplinary authorities to utilize their investigatory powers, if they have not already done so, to review appropriate books and records, etc., in light of this testimony. Upon receipt of any contrary published findings from disciplinary authorities, this Court will institute additional sanctions proceedings.

firm and Alexandria are both lessees of Beebles. The Farkas firm and Alexandria have both mailed advertisement letters to persons in foreclosure using a Farkas firm employee, and in the past Alexandria has referred clients to the Farkas firm for the purposes of bankruptcy filings. All of these family and financial connections, without regard to the intentions of Messrs. Farkas and Timothy Farkas, posed a substantial risk that the Debtor and other bankruptcy clients entering the premises will not be able to discern whether their counsel will act in their best interests, as opposed to being concerned with his own or those related to him.[14] The Debtor clearly expressed that she was concerned whether her counsel would continue to act in her best interest. At a minimum, Mr. Farkas had a duty to make sure that his solicitation was not mailed to existing bankruptcy clients and to make sure that his bankruptcy clients were not approached or engaged in discussions by his brother, Mr. Timothy Farkas, during the process of preparing bankruptcy pleadings.

■ All of these factors lead the Court to conclude that the following sanctions should be imposed pursuant to LBR 2090–2.[15]

First, the Court, pursuant to LBR 9029–1(c), suspends until further notice LBR 2016–1(a)(2) for all bankruptcy cases of the undersigned that are filed by the Farkas firm, including all of its associates and principals. The effect of this suspension is that in order for the Farkas firm to receive compensation in any chapter 13 case, an itemized fee application must be filed and noticed in accordance with the Local Rules. This will enable the Court to more closely scrutinize the nature and quality of work performed by the Farkas firm in future cases.

Second, all compensation paid by the Debtor to the Farkas firm in both cases must be immediately refunded to the

---

**14.** Canon 5 of the Ohio Code of Professional Responsibility requires that counsel exercise independent professional judgment to protect their clients' interests. The associated Disciplinary Rule provides that in the absence of informed consent, lawyers shall not accept employment, "... if the exercise of professional judgment on behalf of the client *will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests.*" DR 5–101(A)(1) (emphasis supplied). The reasons for this requirement are detailed in the associated Ethical Consideration as follows:

> *The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interest of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client.*
> Ethical Consideration 5–1 (emphasis supplied).

Canon 9 of the Ohio Code of Professional Responsibility requires counsel to avoid even the appearance of professional impropriety. The purpose behind this provision is to not only make sure actions are proper but to also make sure that they appear to be so by a high degree of regard for the way actions of counsel are perceived. The associated Ethical Consideration explains that:

> Public confidence in law and lawyers may be eroded by irresponsible or improper conduct of a lawyer. *On occasion, ethical conduct of a lawyer may appear to a layman to be unethical. In order to avoid misunderstandings and hence to maintain confidence, a lawyer should fully and promptly inform his client of material developments in the matters being handled for the client....*
> Ethical Consideration 9–2 (emphasis supplied).

**15.** LBR 2090–2(b) and (c) in relevant part provides:

> ... Whenever appropriate, this court, through its inherent powers, may discipline attorneys who practice before it. Such disciplinary actions, for substantial cause or repetitive actions shown, will be taken only after proper notice and due process and *may include the imposition of monetary sanctions....* After notice and actual hearing, *a bankruptcy judge may recommend suspension of an attorney from practice in the United States Bankruptcy Court for the Southern District of Ohio for a finite period of time,* or under such other terms or conditions as the bankruptcy judge deems appropriate.... (emphasis supplied).

Debtor, and proof of refund shall be filed within ten days from entry of this Order.

Third, upon the Debtor's filing of a statement within ten days from entry of this Order for two days of lost work, plus compensation and parking expenses, and legal fees for attending hearings on the Order to Show Cause, costs will be assessed against Messrs. Farkas and Bannerman jointly and severally, including interest at the statutory rate from date of entry of this Order and costs of collection, including any appeal.

Fourth, Messrs. Farkas and Bannerman, and all attorneys in the Farkas firm that ever appear in the Bankruptcy Court, or handle the bankruptcy cases in any manner, shall attend three consecutive training programs sponsored by the Columbus Bar Association, Judicial Liaison Committee and the Fall 2000 Creditor Education Coalition Seminar, and shall file individual reports with the Court on each program within five days.

Fifth, due to the significant confusion and distress caused to the Debtor by failing to act aggressively once the notice of mortgage default was received, failing to communicate with the Debtor after the foreclosure proceeding was filed, and blindly sending the October 12, 1999, correspondence that was at best confusing regarding the protections afforded the Debtor, Messrs. Farkas and Bannerman shall write letters of apology to the Debtor and file copies with the Court within ten days from entry of this Order, and a judgment in the amount of $2,500.00 is awarded to the Debtor jointly and severally against Messrs. Farkas and Bannerman, including interest at the statutory rate from date of entry of this Order and costs of collection, including any appeal.

**IT IS SO ORDERED.**